# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,       )<br>            )<br>           Plaintiff,      )<br>            )<br>vs.           )<br>            )<br>            )<br>Manuel Plaza-Leon,      )<br>            )<br>           Defendant.      )<br>_____ ) | CR-11-0098-TUC-DCB-DTF<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is Defendant's Motion to Suppress Evidence (Doc. 15). The government responded in opposition (Doc. 17), and Defendant replied to the government's response (Doc. 23). This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Defendant's motion was set for evidentiary hearing and evidence was heard on June 6, 2011 (Doc. 27). This matter was submitted after argument at the conclusion of the hearing and taken under advisement.

Defendant moves to suppress evidence seized by the government as the fruit of Defendant's alleged unlawful stop and detention. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress.

# I.

# **FACTUAL FINDINGS**

On December 16, 2010, Tohono O'odham Police Officer Anthony Yebra was performing a routine patrol at Desert Diamond Casino. (RT 11-12.)[1] At the start of his patrol, approximately 3:45 a.m., Officer Yebra noticed a Hispanic male who appeared lost. (RT 15.) The man was wearing a white and orange striped light jacket, which Officer Yebra described as sticking out. (RT 65-66.) Officer Yebra made initial contact with the man, who identified himself as Benjamin Ramirez Perez (RT 32-33), in order to determine whether he needed assistance (RT 15). Perez communicated to Officer Yebra that he was looking for his friend. (*Id.*) Officer Yebra had noticed a similarly clothed individual, who would later identify himself as Federico Resendiz Garcia (RT 42), in another area of the casino. (RT 15.) Officer Yebra inferred that Garcia was the friend Perez sought and directed him to the other side of the casino. (*Id.*)

Over the course of the next two to three hours, Officer Yebra noticed that Perez and Garcia were together on and off and were walking through the casino without approaching machines. (RT 63-64.) Officer Yebra took this behavior as a possible precursor to criminal activity, "Well it could be panhandling or they could be – in my experience, they could be looking for an opportunity to commit a crime, perhaps steal a ticket or person or wallet." (RT 14-15.) Defendant spent this time gambling on a slot machine. (RT 36.)

At one point, Perez approached another casino patron and, in Officer Yebra's estimation, appeared as if he was engaging in panhandling. (RT 15.) Officer Yebra then approached Perez and asked him for identification. (RT 16.) Perez could not produce valid identification, and eventually admitted to being in the United States illegally. (RT 16-17.) Officer Yebra then approached Garcia and Defendant, who were together at that time, and

---

[1] "RT" refers to the Reporter's Transcript of the June 6, 2011 evidentiary hearing. (Doc. 30.)

- 2 -

both of them claimed not to possess identification. (RT 21-24.) Garcia subsequently admitted to being in the United States illegally. (RT 23.) Defendant provided a false name and false birth date, and stated that his valid work visa at home. (RT 35.) Because Officer Yebra could not confirm Defendant's identity, and he was concerned he might flee, he handcuffed Defendant on the casino floor and contacted Border Patrol. (RT 26, 38-39, 52.) He subsequently documented these encounters in a police report (RT 30) and supplemental report (RT 43).[2]

## II.

## **DISCUSSION**

Defendant seeks to suppress all evidence obtained by the government as a result of his allegedly unlawful stop and detention.[3] (Doc. 15.) Specifically, Defendant argues that any statements made during his initial contact with Officer Yebra should be suppressed because of the race-based nature of the encounter and his fingerprints should be suppressed as the fruit of an unlawful Fourth Amendment seizure. The government responds that Officer Yebra's encounter with Defendant was neither racially motivated nor a stop and was, therefore, constitutionally permissible. (Doc. 17.)

---

[2] Defendant cites Officer Yebra's description of him as a Hispanic male, in the police reports and on the label of the interrogation DVD, as evidence of a racial pretext for their initial encounter. The Court was not provided with the police reports and, thus, has only a photocopy of the DVD label and Officer Yebra's testimony regarding this issue.

[3] The Government conceded at oral argument that Defendant's post-detention, pre-*Miranda* statements to Officer Yebra and Border Patrol Agent Jusdan Pang are inadmissible, and it does not plan to raise those statements in its case-in-chief. This Report and Recommendation, therefore, does not address those statements. In light of the government's concessions and the evidence presented at the hearing, Defendant parsed his argument significantly from what was raised in his motion and reply. Because counsel had to do so under questioning from the Court and with little time for reflection, the Court has made its best effort to characterize his remaining arguments as clearly as possible.

**A. Initial Encounter**

Defendant asks the Court to suppress his statements made to Officer Yebra at the time he initially questioned him on the floor of the casino. In response to questions by Officer Yebra, Defendant stated that he had just met Perez and Garcia, that he did not have identification with him but he had a work visa at home. (RT 24.) Defendant stated that his name was Jose Dolores Cruz, with a birth date of January 11, 1974. (RT 35.) Defendant requests suppression based on the Fourth and Fifth Amendments, and because he argues that Officer Yebra stopped and questioned him based purely on race.

First, the police are permitted to approach individuals in public places and ask questions without implicating the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 497 (1983). A consensual encounter only turns into a Fourth Amendment seizure when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). At argument, Defendant conceded that the initial encounter, prior to Defendant being handcuffed, did not amount to a detention under the Fourth Amendment. (RT 90-93.) Therefore, there is no Fourth Amendment basis to suppress any evidence obtained in the initial encounter.

Second, Defendant argues, however, that because the initial encounter was race-based it constituted an egregious violation of his constitutional rights. Although the Fourth Amendment was not relevant to the consensual encounter, the Equal Protection Clause could be implicated by this fact pattern. Consensual searches may violate equal protection when they are initiated solely based on racial considerations. *United States v. Travis*, 62 F.3d 170, 173 (6th Cir. 1995). The burden lies with Defendant to "demonstrate by a 'preponderance of the evidence' that a police officer decided to approach him or her solely because of his or her race." *Id.*

Here, Defendant has not met his burden. The only pieces of evidence proffered are (1) a photocopy of the label on the police department's interrogation DVD describing

1  Defendant, Garcia, and Perez collectively as "3-Hispanic males," and (2) Officer Yebra's
2  testimony that his police reports describe Defendant as a Hispanic. This evidence does not
3  establish a showing of racial pretext by the requisite preponderance. The government
4  presented evidence that Officer Yebra initiated questioning of Defendant because he was
5  affiliated with Garcia and Perez, who were not engaged in casino activities, and Perez may
6  have attempted to panhandle and admitted to being in the country illegally. Thus, the initial
7  encounter between Officer Yebra and Defendant was not unconstitutional on this basis.

8  Third, the evidence Defendant seeks to suppress is the false identity he provided to
9  Officer Yebra. Even if he provided his identity under unlawful circumstances, Ninth Circuit
10 law provides that "a criminal defendant cannot suppress his identity, even when there has
11 been some prior illegality on the part of the government." *United States v. Ortiz-Hernandez*,
12 427 F.3d 567, 577 (9th Cir. 2005) (citing *Immigration and Naturalization Serv. v. Lopez-*
13 *Mendoza*, 468 U.S. 1032, 1039 (1984)). Identity evidence cannot be suppressed as fruit of the
14 poisonous tree, even if it was obtained as a result of an egregious constitutional violation.
15 *United States v. Garcia-Beltran*, 389 F.3d 864, 868 & n.5 (9th Cir. 2004); *United States v.*
16 *Del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004). Barring a change in the law, the
17 exclusionary rule does not apply to such evidence.

18 Finally, to the extent Defendant is contending that this encounter violated his Fifth
19 Amendment right not to incriminate himself, the argument is unfounded. Defendant provided
20 Officer Yebra with a false alias and, as such, the "fruits" of the identification evidence are
21 non-existent rather than poisonous.

22 **B. Fingerprints**

23 Defendant argues his fingerprints should be suppressed because he was being held in
24 violation of his Fourth Amendment rights at the time they were obtained. When a person is
25 unlawfully detained, fingerprints taken for criminal investigatory purposes should be
26 suppressed. *Hayes v. Florida*, 470 U.S. 811, 814-15 (1985); *Davis v. Mississippi*, 394 U.S.
27 721, 727-28 (1969). However, fingerprints taken to establish a person's identity, rather than

for criminal investigation, are admissible even if unlawfully obtained. *Garcia-Beltran*, 389 at 867-68. The Court must assess whether the fingerprinting of Defendant was done as a matter of course, as part of routine booking procedures, or as part of a criminal immigration violation. *Id.* at 868.

Agent Pang testified that when he went out to the casino he approached it as an administrative immigration matter. (RT 82.) While there, he conducted an immigration inspection and determined Defendant was a national of Mexico without documents allowing him to be in the country legally. (RT 78.) Agent Pang completed a field processing form for a civil immigration violation (Form 826), which informed Defendant of his administrative rights. (RT 81, 83-84.) Agent Pang then transported Defendant to the Tucson Coordination Center for processing by other agents. (RT 80-81.)

The Court has only limited evidence available to assess whether Defendant's detention was unlawful. Regardless, even if it was unlawful, the fingerprints are admissible. The evidence indicates that Defendant's fingerprints were taken for the purpose of identifying him, in relation to an administrative immigration matter. This is in contrast to *Hayes*, 470 U.S. at 812, *Davis*, 394 U.S. at 1395, and *United States v. Garcia-Beltran*, 443 F.3d 1126, 1129 (9th Cir. 2006), because in each of those cases the fingerprints sought to be suppressed were taken when the defendant's identity was known. Agent Pang's investigation was completed when he determined Defendant had committed a civil immigration violation because he was illegally in the United States. Thereafter, Defendant was transported to the Tucson Coordination Center, where his fingerprints were taken as part of the process for that violation. The fingerprints were not obtained for purposes of solving a crime or prosecuting Defendant. The fact that Defendant was later charged with a criminal violation was merely a byproduct of the discovery of his true identity and history, but was not the intended purpose for the fingerprinting.

## III.

## **RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendant's Motion to Suppress. (Doc. 15).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR-11-098-TUC-DCB**.

DATED this 15th day of June, 2011.



D. Thomas Ferraro
United States Magistrate Judge